Brinkerhoff, J.,
concurring. The plaintiff claims to be lawfully exempt from any other or further tax than that of six per *cent. of her net profits, as named in the 60th section of the act of February 24, 1845, “to incorporate the State Bank of Ohio and other banking companies,” all subsequent legislation on the subject to the contrary notwithstanding. Is she entitled to such exemption? This is the question of the case, and depends, in my mind, solely on the solution to be given to this subordinate question — to wit, does the said 60th section, taken in connection with the fact that the plaintiff has been duly organized and gone into operation under the act aforesaid, constitute a contract for the exemption claimed, or not ? If it does constitute such contract, then the plaintiff is entitled to the exemption which she claims: for I admit the power of a state, in the absence of constitutional restriction, and through the medium of a legislative act, to contract for the exemption, for any period, of any given property, person, or thing from taxation; and such contract, when made, is binding on the state, and ought to be enforced by all courts having jurisdiction of the question. - Matheny v. Golden, 5 Ohio St. 361. If said 60th section does not constitute such contract, then there was no constitutional obstacle to the alteration, amendment, or repeal of the legislation contained in that section, and subsequent legislation, imposing an additional, but more equal, and therefore more equitable, rate of taxation upon capital employed in banking, is of valid obligation.
Said 60th section (Swan’s Rev. Stat. 99) is as follows:
“ Each banking company organized under this act, or accepting thereof and complying with its provisions, shall semi-annually, on the days designated in the 59th section for declaring dividends, set off to the state six per centum on the profits, deducting therefrom the expenses and ascertained losses of the company, for the six months next preceding; which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject; and *457 the cashier shall, within ten days thereafter, inform the auditor of state of the amount so set off, and shall pay the same to the treasurer of state, on the order of said auditor; but in computing the profits of the company, for the purposes aforesaid, the interest received on the certificates of the funded debt of this state, held by the company, or deposited with and transferred to the treasurer of. state, or to the board of control, by such company, shall not bo taken into the account.”
*Is this a contract for the exception claimed for the twenty years to which the operation of the act is limited?
In considering this question it is important to remark in the outset, that however great may be the differences of opinion which •have arisen among jurists and statesmen on the general subject of legislative contracts, through the medium of charters and acts of incorporation, there is one rule, fundamental and-vital in this discussion, in reference to which there is no difference of opinion, or, at all events, so far as I know, no difference of authority; and that is, that where an exemption from taxation, in whole or in part, is claimed on the ground of a legislative ■ contract, such contract must he expressly contained in the terms of the act, and will not he presumed. Such claims, being odious and unequal in themselves, in derogation of common right, and of that principle of equality before the law, characteristic of our institutions and of all just governments, are not favored in law, and courts ought not to resort to presumptions to sustain them. Such is the rule, substantially, as laid down by Chief Justice Marshall in Providence Bank v. Billings and Pittman, 4 Pet. 561; by Taney, C. J., in Charles River Bridge v. Warren Bridge, 11 Pet. 420; by Ranney, J., in Debolt v. Ohio Life Ins. and Trust Co., 1 Ohio St. 573. It is in the light of this rule — a rule sanctioned by the highest and most venerated authority, and the wisdom and justice of which commend it to my reason and conscience — that I look at this statute; and, excluding all assumptions and presumptions, inquire whether the contract for the exemption claimed, is to be found in express terms embodied therein?
Looking at the section of the act above quoted in this light, I confess my inability to find there any such contract.
In rhe first place, its language is not the language of contract,, but the language of ordinary legislative enactment. There is nothing to indicate that anything out of the ordinary current of legislation was intended. There is nothing said about contracts, agree *458 ments, bond, or obligation; and no phraseology such as men and states ordinarily employ, when they aim to give expression in langnageto a contract obligation; and to me it seems strange that an ^intelligent legislative body should have left a matter of such momentous interest to remote inference or conjecture, when the use. of the most familiar terms usually employed in the making of contracts would have placed the matter beyond all doubt.
In the second place, I find no consideration for such, or for any contract. None whatever is expressed ; and if we were at liberty to resort to implication, I should not know where to look for an implied consideration. The bank or banks organized under the act named, give no bonus to the treasury of the state, nor to^ the promotion of any object of state policy, for the privileges and exemptions which the act of incorporation confers, and which might constitute a good-consideration for any stipulated exemptions. On all this subject the act is silent. And if we were to inquire for an implied consideration, I repeat, I do not know where we should look for it. Capitalists who embark in banking under this act sacrifice nothing to the state. They give nothing to, and they do nothing for the state. The act is, from beginning to end, a grant, on the part of the state, of extraordinary powers and privileges, not possessed by other citizens, to those who shall embark in the business of banking under it, and this, without stipulating for the doing for, or giving to, the state anything in return, from which a good legal consideration can be fairly implied. These powers and privileges are, it is true, limited and restricted in many important particulars. But it will hardly be contended that a limitation upon what is of itself purely a gratuitous grant of extraordinary privilege, is a legal consideration for such grant, and that a matter of mere grace can thus be transformed into one of binding obligation. Nor can any consideration be inferred .from any mutuality of obligation. No man or set of men is, by the provisions of this act, placed under any obligation to enter upon the business of banking under it, or, having entered, to continue it. The bank which might be organized under the act one day, was free to abandon its corporate existence, and discontinue its business the next.
It seems to me, therefore, that unless I am in error in supposing that a consideration of some kind is essential to the existence of *a valid contract, here is no contract either expressed or implied.
*459 In the third place, the act fixes no time during which the six per centum of net profits shall be in lieu of all other taxes to which such company would otherwise be subject. The plaintiff claims' that this rate of taxation shall not be exceeded during the whole twenty years to which the operation of the act was, by its terms, limited. I find no express stipulation to that effect in this sixtieth-section. Presumptions are excluded by the rule of construction-before mentioned; and therefore I look at this language in the same light as if it were employed in reference to the taxation of any other species of property belonging to individuals. And can any one doubt, that, if a legislative act, on the subject of taxation, and under the constitution of 1802, had used identical language in-respect to horses, or farms, or merchandise, and had declared generally that they should pay six per centum upon their profits, “ in lieu of all other taxes,” naming no time during which this rate and' rule of taxation, should continue, it would have been competent for any subsequent legislature to prescribe another and different rate and rule? Under that constitution, as matter of fact, the rule and rate of taxation, on different kinds of property and business, was-frequently and constantly changed from time to time, and no one-thought of questioning the validity of such changes, although particular property may have been acquired, and particular branches of business may have been undertaken under the belief that the then-existing rate and rule of taxation would be adhered to in the future. However greatly individuals, under such circumstances, may have been disappointed in their hopes, there being no contract in the case, they were left to continue or discontinue the ownership of property or the prosecution of their business, under the altered circumstances, as they might suppose to be to their advantage.
Had this act of the general assembly declared in express terms, in the following, or any other equivalent language, “that, in consideration of a bonus of one per centum upon its capital stock, to be-paid into the treasury of the state by any banking company to be organized under this act, no more than six centum upon the net profits of any such company shall be levied or collected as taxes on such company in any one year for the term of twenty years,” the question before us would be very different. Bo, if' any extraordinary services were exacted from these companies, not due-as matter of common duty from citizens at large. But, being unable to find any consideration for the contract of exemption *460 claimed, and no stipulation for the continuance of such exemption, I fail to find the essential elements of an express legal contract, and am therefore compelled to concur with the majority of the court in the conclusion to which they have arrived.
I am aware that the Supreme Court of the United States have decided the question here pending, adverse to the views I have expressed. In those cases I have bowed in submission to the mandates of that court, and have concurred in ordering them to be entered on our journals. . But these decisions are understood to have been made by a bare majority of that court; and, as its reasoning has failed to satisfy my judgment, I am desirous that it should have an opportunity to reconsider them.
J. R. Swan, J.
One of the questions made in this case is, whether the general assembly, who enacted the 60th section of the charter of the State Bank of Ohio, intended that section as a stipulation, fixing, beyond alteration or change, the amount of tax upon the banks. Whether the state can enter into such a stipulation, is not a question discussed in this case, nor does it arise in the opinion of the majority of the court. The sole question here is: Did the general assembly intend this 60th section as such stipulation.
In 1835, the Supreme Court of this state decided the case of The State v. Commercial Bank of Cincinnati, 7 Ohio, 129, 130. The question in that case, and its .determination, is thus stated by the court:
II Th.e clause in the charter which is supposed to exempt the Commercial Bank from the payment of a tax upon its business, similar to that paid by other banks, is that which has been already quoted:
‘ The State of Ohio shall be entitled to receive *four per cent, on all dividends made by said bank.’ Now, let us for a moment examine this subject, considering the charter as a contract, and applying to it the ordinary rules of construing contracts.
“ The general assembly propose to confer upon such persons as .shallbecome stockholders in the bank, certain powers and privileges. They propose to confer upon them all the privileges of banking. But, as these privileges are valuable to the recipients, it seems to be but right and proper that a suitable return should be made for the benefit received. Therefore, the legislature impose upon the corporators, in their corporate capacity, the. condition that they shall pay to the state four per cent, of their dividends,, and they reserve *461 to themselves no right to change these terms. The only consideration required, the only consideration to be paid, is this four per cent. In other words, the general assembly say to such persons as may take the stock, you may enjoy the privileges of banking, if'you will consent to pay to the State of Ohio, for this privilege, four per cent, on your dividends, as they shall from time to time be made. The charter is accepted-, the stock is subscribed, and the corporation pays, oris willing to pay, the consideration stipulated; to wit, the four per cent. Here is a contract, specific in its terms, - easy to he understood. Privileges are proffered for certain and definite considerations to be paid; and those privileges being accepted, the payment of the consideration can be enforced. After a contract similar to this, between individuals, where one undertook to convey any interest to another for a definite consideration, and the conveyance is made and accepted, it will not be pretended that anything more than the definite consideration can be recovered. But a contract between the state and individuals is as obligatory as any other contract. Until a state is lost to all sense of justice and propriety, she will scrupulously abide by her contracts; more scrupulously than she will exact their fulfillment by the opposite contracting party. As here was a contract between the state and the corporators of the Commercial Bank, in their corporate capacity, that the latter should enjoy certain privileges, in consideration of certain payments to be made, any *law requiring the payment of a greater amount, varies this contract and impairs its validity. The tenth section of the first article of the constitution of the United States provides, that no state shall pass any law impairing the obligation of contracts ; and the sixteenth section of the eighth article of the constitution of Ohio, that ‘no ex post facto law, or law impairing the validity of contracts, shall ever be made.’ A law, then, made in express terms, and for the avowed purpose of collecting a greater tax than four per cent, upon its dividends, from the Commercial Bank, would be in contravention of both these constitutions, and could not be enforced, unless we adopt the principle that an unconstitutional legislative enactment is a binding law of the land; unless we adopt the principle that the law-making power is above the constitution under which it acts; unless, in fact, we adopt the principle, that in this country, where we boast of constitutional and limited government,- legislative supremacy is co-extensive with with parliamentary omnipotence.”
*462 Collett, judge, dissented,- but the grounds of his dissent are not •stated.
This decision of the Supreme Court determined and settled, as .fully as the highest judicial tribunal of the state can settle any question within its constitutional jurisdiction, that when the general .assembly provide in a bank charter that “the State of Ohio shall be entitled to receive four per cent, on all dividends made by said bank,” the legitimate interpretation and constructioñ of such language is, that the general assembly intend and do stipulate that the tax so provided for is fixed beyond alteration. '
Whether these terms in the charter were so express and explicit ¡as to justify the construction given them by the court, I do not stop to inquire, for we are now dealing with the simple fact, that the .Supreme Court gave to them, by interpretation and construction, the force and effect of such a stipulation.
This judicial construction was promulgated in 1835; remained, without being questioned or doubted by the Supreme Court, as the law of Ohio, when the general assembly, in 1845, introduced into the charter of the State Bank of Ohio the following section:
*“Each banking company organized under this act, or accepting thereof and complying with its provisions, shall, semiannually, on the days designated in the fifty-ninth section for de•claring dividends, set off to the state six per centum on the profits, •deducting therefrom the expenses and ascertained losses of the company, for the six months next preceding; which sum or amount, so ■set off, shall be in lieu of all taxes to which such company or the stockholders thereof, on account of stock owned therein, would otherwise be subject; and the cashier shall, within ten days thereafter, inform the auditor of state of the amount so set off, and shall pay the same to the treasurer of state,” etc.
And now the question is, in view of the previous adjudication of the Supreme Court, whether the general assembly intended that these terms should have the force and effect which'judicial interpretation had given like terms, less express and explicit, and less clearly indicating a stipulation fixing the amount of taxes. The general assembly must bo presumed to know — indeed, no one can deny that they in fact knew — what construction had been given to like but more uncertain terms, by a co-ordinate branch of the gov■ernment, authorized to construe statutes and charters. How, then, ■can any one entertain the remotest doubt that this section was in *463 serted in the charter of the State Bank with an intention that it should have the force and effect which had been given to like language by the Supreme Court?
Whatever opinion this court may entertain of the intention of the general assembly who granted the charter to the Commercial Bank, it seems to me that there can be no doubt of the intention of the general assembly who passed the charter of the State Bank. The first was an open question for judicial determination on the terms of a charter; the second is the grant of a charter based upon that judicial determination. Besides, what is the position of this court now upon this question ?
The highest judicial tribunal of the state, and upon which devolves the power of interpreting statutes and charters, determine and fix, in 1835, the force and effect of certain words in a charter. These words were held to create a specific contract ^between the state and citizens who might become stockholders under the charter. After this determination had been promulgated for ten years, the general assembly adopt like words in a charter, and citizens become •stockholders. The two co-ordinate branches of the government thus .proceed harmoniously, the one first fixing the interpretation, force, and effect of words in a charter, and the other afterward incorporating the like words in charters. And now the same judicial ■department of the government is called upon to say that these same words, which it had before pronounced “a contract, specific in its terms, easy to be understood,” so uncertain in their terms and so difficult to be understood, that, on the whole, the general assembly who used the words in view of previous judicial interpretation, could not have intended them as any stipulation whatever.
A question is made in this case as to the continued operation of the act of March 7, 1842, after its repeal.
The act of March 7,1842 (Curwen, 907), reserved to the general assembly the right to alter or repeal all charters thereafter granted. The chai’ter of the State Bank of Ohio was passed February 24, 1845, and afterward, and at the same session, by act of March 12, 1845, the act of March 7, 1842, was repealed. The act of February 24, 1845, however, for the organization of the State Bank, did not become operative as a charter, or any citizens accept its provisions, or cox’poration exist under it, until after the repeal of the act of March 7,1842. It is insisted that the general assembly, by force of the act thus repealed, can now change and modify the rights of the *464 ■corporators under the charter of the State Bank. On the contrary, it seems to me that the very object, intent, and effect of the repeal of that law by the general assembly, was to divest them of the powers reserved by it.
I do not deem it necessary to discuss the last two propositions of the syllabus, at the head of this case. They are not so definite and limited as to meet my concurrence; and the principles involved in them have not in my opinion any application to the ^present case. I am constrained, therefore, to dissent from all the rulings in this case.
Scott, J., also dissented on the same grounds.